## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| SHARON A. MOORE, | ) |
| | ) |
|     *Plaintiff* | ) |
| | ) |
| v. | )    *Docket No. 06-136-B-W* |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| **Commissioner of Social Security** [1] | ) |
| | ) |
|     *Defendant* | ) |

### *REPORT AND RECOMMENDED DECISION*[2]

This Social Security Disability ("SSD") appeal raises the question whether the commissioner properly found that the plaintiff, who alleges that she has been disabled since June 15, 1985 by mental retardation, cognitive dysfunction, memory loss, migraine headaches and comprehension problems, suffered no severe impairment as of December 31, 1990, her date last insured. I recommend that the decision of the commissioner be affirmed.

In accordance with the commissioner's sequential evaluation process, 20 C.F.R. § 404.1520, *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff had acquired sufficient quarters of coverage to

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), I have substituted currently serving Commissioner of Social Security Michael J. Astrue as the defendant in this matter.

[2] This action is properly brought under 42 U.S.C. § 405(g). The commissioner has admitted that the plaintiff has exhausted her administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on July 3, 2007 pursuant to Local Rule 16.3(a)(2)(C), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority and page references to the administrative record.

remain insured only through the close of 1990, Finding 2, Record at 23; that, prior to that time, she did not suffer from any severe impairment or combination of impairments meeting the applicable durational criteria, Finding 3, *id.*; and that she therefore was not under a disability at any time prior to the close of 1990, Finding 4, *id*. The Appeals Council declined to review the decision, *id*. at 6-9, making it the final determination of the commissioner, 20 C.F.R. § 404.981; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. § 405(g); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 2 of the sequential evaluation process. Although a claimant bears the burden of proof at this step, it is a *de minimis* burden, designed to do no more than screen out groundless claims. *McDonald v. Secretary of Health & Human Servs.*, 795 F.2d 1118, 1123 (1st Cir. 1986). When a claimant produces evidence of an impairment, the commissioner may make a determination of non-disability at Step 2 only when the medical evidence "establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered." *Id.* at 1124 (quoting Social Security Ruling 85-28).

The plaintiff complains that the administrative law judge erred in (i) failing to adequately assess the severity of her cognitive impairments at Step 2 of the sequential-evaluation process and (ii) neglecting to evaluate two critical medical opinions in accordance with 20 C.F.R. § 404.1527(d).

*See generally* Plaintiff's Itemized Statement of Errors ("Statement of Errors") (Docket No. 6). I find no error.

## I. Discussion

This is a case in which two endpoints are clear and undisputed: In 1974, when the plaintiff was seventeen years old, she suffered a head injury significant enough to render her unconscious, *see* Record at 19, 232, and as of the date of decision she had mental impairments of disabling severity, having been determined during the course of an inpatient psychiatric hospitalization in February 2006 to have a full-scale IQ score of 58, consistent with a moderate level of mental retardation, and severely to profoundly impaired cognitive abilities, including profoundly impaired immediate-memory ability, *see id*. at 20-21, 312. The murky ground lies in the middle. The plaintiff contends that, as a result of the head trauma she suffered as a teenager and perhaps other factors (she claims to have been a special-education student), her cognitive abilities should have been found, at the least, to have been severely impaired as of her date last insured for purposes of the *de minimis* showing required at Step 2. *See* Statement of Errors at 1-2. She suggests that the administrative law judge wrongly concluded otherwise by way of a flawed analytical path, having failed to consider the opinions of consulting psychologist William M. DiTullio, Ed.D., and treating psychiatrist Takeo Kawamura, M.D., and neglected to apply the proper psychiatric review technique. *See id*. at 1-3. I am unpersuaded.

As of the time of the plaintiff's April 18, 2006 hearing, she had submitted no contemporaneous evidence from the relevant period (1985 to 1990) – medical, psychological or psychiatric – indicating that she suffered from cognitive impairments during that time. Nor was there any lay testimony to that effect apart from her own. Just prior to her hearing, she did submit a mental residual functional capacity ("RFC") assessment dated April 10, 2006 and a report dated April 11, 2006 from Dr. DiTullio, to whom her counsel had referred her for a psychological evaluation. *See* Record at 359-63.

Dr. DiTullio identified eight of twenty listed mental work-related activities as markedly limited or effectively precluded by the plaintiff's symptoms. *See id*. at 359-60. He expressed an opinion that symptoms of a disabling level of severity commenced in the mid-1980s, stating, in relevant part:

> Intelligence testing at Acadia Hospital in Acadia's 2/28/06 report found IQs in the Mentally Retarded range of functioning. By [the plaintiff's] report, and from what she said doctors have told her, her disabilities, both emotionally and cognitively, began as a result of the 1974 car accident. Also, I am not aware of any evidence of additional head trauma over the ensuing years. While claiming to feel better emotionally today because of medications, [the plaintiff] remains cognitively impaired with significant organically-based problems in perceptual-motor coordination (likely the reason she was let go from Ames for doing things "back-to"). The disabling conditions of cognitive impairment with perceptual-motor problems and a tendency to easily become confused, and intellectual functioning in the mentally retarded range do appear to have been significantly disabling at least back to the mid-1980s when she was let go from Ames.

*Id*. at 363.[3] At hearing, the administrative law judge called upon the services of a medical advisor, Peter B. Webber, M.D., whose testimony made clear he had reviewed, *inter alia*, Dr. DiTullio's report and records of the plaintiff's 1974 hospitalizations. *See id*. at 44-45. Dr. Webber observed that records of treatment following the plaintiff's 1974 automobile accident revealed that (i) she was brought to the emergency room following the accident in a semi-comatose state and remained hospitalized for ten days, (ii) her neurological examination was normal except for loss of consciousness, (iii) two days after her discharge, she was rehospitalized for an additional five days as a result of complaints of headache, nausea and anorexia, (iv) during the first hospitalization, she was suspected to have sustained a basal skull fracture as well as a concussion and contusions, and (v) during the second hospitalization, the diagnosis of skull fracture was dropped. *See id*. at 45; *see also id*. at 227, 229-30, 232-33. Dr. Webber testified that while the plaintiff's mental impairments

---

[3] In informing Dr. DiTullio that she did things "back-to," the plaintiff evidently meant she was doing things wrong. *See* Record at 362. She told Dr. DiTullio that she was fired from an Ames Department Store shelf-stocking job after two months for having done everything "back to," that she was prone to making a lot of mistakes and that she did not dare go back to work. *See id.*

currently were sufficiently severe to be considered disabling, the picture was considerably murkier with respect to the onset of her cognitive difficulties:

> [S]he's got a full scale IQ of 58, and a VIQ of 55, with a PIQ of 67. Now, that kind of implies that either she's always been this way or something at some time changed whatever her previous IQ was. But we don't know much about it. Now, the only thing we can hang our hats on is the evidence of a car accident which I don't doubt was of significant degree. The problem with that is there are very few records [–] that she's had a relatively short hospitalization at the time of the car accident. Her neurologic examination, other than her confused state and semi-comatose state, was normal. I didn't see that – and whatever studies were done at that time were normal. Now, you can miss a basal skull fracture. If it had been a major large fracture and actually had showed internal hemorrhage – now she had external bleeding from her nose and ears. But whether this implied there was actually central nervous system bleeding is open to question because their studies didn't document anything. So I think it's very difficult to state that all her current problems were caused by that accident. I certainly can't say they weren't. I just don't know. If there was some way or some family members who knew her status, who – or friends at that time of her life or employers at that time could help with the documentation as part of – as to what her problems of why did she drop out of school, things like that; and what her performance was back then, I would feel much more comfortable saying obviously this goes back to that accident, and there's no concern about it.

*Id.* at 50-51. The administrative law judge gave the plaintiff's counsel one month to submit additional evidence, including school records and lay evidence. *See id.* at 51-52, 57. Although, at hearing, the plaintiff and her counsel identified several potential lay witnesses, *see id.* at 58-63, the plaintiff submitted only one affidavit post-hearing, which shed no light on her condition either prior to the accident or during the 1985-90 time period, *see id.* at 171. The plaintiff also submitted a mental RFC assessment dated April 28, 2006 from Dr. Kawamura and progress notes from his office reflecting visits on March 15 and March 29, 2006. *See id.* at 364-75. Dr. Kawamura identified ten of twenty listed mental work-related activities as markedly limited or effectively precluded by the plaintiff's symptoms, *see id* at 364-65, stating: "past hx [history] closed head injury [with] craniotomy 1975 residual [e]ffects[,]" *id.* at 365. The March 15, 2006 treatment note states, in relevant part: "Client has hx [history] significant head injury and subsequent craniotomy in 1975 with resulting memory

impairment that complicates tx [treatment]." *Id*. at 370.

As the plaintiff observes, *see* Statement of Errors at 3 & n.1, the administrative law judge did not explicitly cite or discuss the opinions of either Dr. DiTullio or Dr. Kawamura in finding that her cognitive impairments were non-severe as of her date last insured, *see* Record at 14-23. Nonetheless, she referenced them by exhibit number, explaining why she had rejected them in stating:

> While it has certainly been speculated that her current cognitive deficits *resulted* from her head injury (Exhibits 15F, 16F and 14F), there is no objective medical evidence describing the *severity* of these deficits prior to the date she last met the disability insured status requirements of the Social Security Act. Nor is there objective medical evidence suggesting that they had become 'severe' prior to that date or describing their progression between the alleged date of onset of her disability and that date.

*Id*. at 22 (emphasis in original).[4] The administrative law judge further buttressed her finding of non-severity of the plaintiff's cognitive impairments as of her date last insured by accurately noting:

1. "[B]oth the state agency psychologists and Dr. Webber were of the opinion that there was no objective evidence of the existence of severe cognitive impairment prior to the date she last met the disability insured status requirements." *Id*. at 21 (citation omitted); *see also id*. at 50-51 (testimony of Dr. Webber), 180 (Psychiatric Review Technique Form ("PRTF") completed by Thomas Alex, Ph.D., finding insufficient evidence – "i.e., a programmatic documentation deficiency is present" – prior to the plaintiff's date last insured), 289 (PRTF completed by Lawrence P. Johnson, M.D., finding insufficient evidence prior to the plaintiff's date last insured).

2. The plaintiff herself told a neurologist in March 2006 that memory loss had become a problem about two years earlier – well after her date last insured. *See id*. at 22; *see also id*. at 355 ("She says memory loss has been a problem for about two years.").

3. The plaintiff had a negative brain scan in 1974. *See id*. at 22; *see also id*. at 227. It

---

[4] Exhibit 14F is Dr. DiTullio's mental RFC assessment. *See* Record at 359-60. Exhibit 15F is Dr. DiTullio's written report. *See id.* at
*(continued on next page)*

was possible her deficits might actually be the result of dementia, a progressive disease, which may have been caused or exacerbated by breathing fumes from glue used in a shoe-industry job. *See id*. at 22; *see also id*. at 203, 315.

4. Any deficits that existed prior to the end of 2004 did not prevent the plaintiff from earning a high-school diploma that year. *See id*. at 22; *see also id*. at 355.[5]

5. Although the Record had been held open to permit the plaintiff to obtain descriptions from four individuals regarding changes in her personality and mental functioning that occurred after her motor vehicle accident, no evidence was submitted that suggested the existence of severe cognitive deficits prior to that date. *See id*. at 22; *see also id*. at 171.[6]

The burden was on the plaintiff, for purposes of Step 2, to persuade the commissioner that she suffered from a severe impairment. *See McDonald*, 795 F.2d at 1123. The administrative law judge's Step 2 determination was supported by substantial evidence on the Record as it existed following a full and fair opportunity to submit documents supportive of the plaintiff's claim.

In view of the foregoing discussion, the plaintiff's remaining points of error – that the administrative law judge failed to follow the required psychiatric review technique or assess the opinions of Drs. DiTullio and Kawamura in accordance with 20 C.F.R. § 404.1527 – readily can be seen to be lacking merit.

The plaintiff essentially faults the administrative law judge for having failed to rate the degree

---

361-63. Exhibit 16F is Dr. Kawamura's mental RFC assessment. *See id*. at 364-65.

[5] The administrative law judge mistakenly listed the date as 2000; however, that mistake made no different to her analysis. Her basic point was that the plaintiff, through a date well past her date last insured, had retained sufficient cognitive ability to complete her high-school diploma.

[6] The plaintiff states, *inter alia*, that she was a special-education student. *See* Statement of Errors at 1. While she has made that claim at various points, *see, e.g.,* Record at 333 (March 9, 2006 Acadia Hospital note reflecting report by plaintiff that she "was in special education all through her schooling"), 362 (report to Dr. DiTullio that she "was in special classes for 'everything – all the subjects[,]'" although prior to the accident she did not do things "back to"), the one school record she provided (for high school) does not reveal special-education status through the date she dropped out of high school in September 1976 (two years after her accident), and she
*(continued on next page)*

of functional limitation imposed by her mental impairments as of her date last insured prior to determining those impairments non-severe. *See* Statement of Errors at 2-3; *see also* 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe[.]"). However, as discussed above, the administrative law judge supportably found that the plaintiff had adduced insufficient evidence to assess the severity of functional limitations (if any) caused by her mental impairments prior to her date last insured. In essence, the administrative law judge determined that, while it was clear the plaintiff had suffered a head injury in 1974, it was far from clear she even suffered from a medically determinable mental impairment during the relevant period (from 1985 to 1990). In such circumstances, an adjudicator need not go on to the next step of the prescribed technique and rate the degree of functional limitation in the four specified areas. *See* 20 C.F.R. § 404.1520a(b). There thus was no error in application of that technique.

Finally, the plaintiff's complaint regarding the handling of the DiTullio and Kawamura opinions rests on a faulty foundation: the premise that the administrative law judge "ignored" them. *See* Statement of Errors at 3. As noted above, the administrative law judge made clear enough that she considered both Drs. DiTullio and Kawamura to have merely speculated, in the absence of objective medical evidence, that the plaintiff's cognitive impairments were present prior to her date last insured. This constituted "good reason" for rejecting those opinions in favor of Dr. Webber's considered view that, in light of (i) the complete lack of objective medical evidence in 1974 that the head injury had imposed any lasting brain impairment and (ii) the absence of any medical or lay evidence (apart from the plaintiff's own testimony) that she suffered cognitive impairments during the relevant period (1985 to 1990), he could not hazard a guess that she did suffer such impairments then.

---

acknowledged at hearing that she was not a special-education student, *see id.* at 52, 168.

Further, as the plaintiff implicitly acknowledges, Dr. DiTullio was not a "treating source." *See id*. at 3-4. While the plaintiff characterizes Dr. Kawamura as such, *see id*. at 4, it is questionable whether he so qualifies. Inasmuch as appears, Dr. Kawamura did not personally examine the plaintiff on either the March 15 or the March 29 visit. *See* Record at 366-75; *see also* 20 C.F.R. § 404.1502 (defining a "treating source" as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."). In any event, even if both Drs. DiTullio and Kawamura did qualify as "treating sources," their opinions touched on subject matters with respect to which decision is reserved to the commissioner, and even treating-source opinions are accorded no "special significance" – disability and RFC. *See* 20 C.F.R. § 404.1527(e)(1)-(3).

While medical opinions – even on subjects reserved to the commissioner and even from non-treating sources – are to be assessed in accordance with certain enumerated factors, such as length of treatment relationship, supportability of the opinion and consistency with the record as a whole, *see id*. § 404.1527(d)(2)-(6); Social Security Ruling 96-5p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2006) ("SSR 96-5p"), at 124 ("In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR 404.1527(d) and 416.927(d)."), there is no requirement that an administrative law judge slavishly discuss every one of those factors in his or her decision. Even as to a treating source's opinion, the stated requirement is that the adjudicator "always give good reasons in our notice of determination or decision for the weight [she] give[s] your treating source's opinion." 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-5p at 127 (even as to issues reserved to commissioner, "the notice of the determination or decision must explain the consideration given to the treating source's opinion(s)"). Good reason was supplied for rejection of the DiTullio and Kawamura opinions. No

9

more was required.

## II. Conclusion

For the foregoing reasons, I recommend that the commissioner's decision be **AFFIRMED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 11th day of July, 2007.

/s/ David M. Cohen  
David M. Cohen  
United States Magistrate Judge